# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **Criminal No. 10-10299-MLW** |
| | ) | |
| THEODORE GAMBLE | ) | **LEAVE TO FILE GRANTED 9/14/16** |

## OPPOSITION TO MOTION TO VACATE AND REQUEST FOR SUMMARY DISMISSAL

The scandal surrounding Annie Dookhan's activities at the Department of Public Health's lab in Jamaica Plain ("the JP Lab") remains profoundly disturbing.   It has shaken public confidence in the criminal justice system and continues to divert millions of scarce public dollars away from other pressing criminal justice needs.   But its effects are most tragic for any of the very few defendants—and to date there appear to have been six[1]-- who had exhibits altered by Dookhan to create the illusion they were peddling illegal drugs.

But the realities are that Dookhan's foibles, as serious as they may be, have no bearing on this case. Because the sale of counterfeit drugs is an extremely isolated phenomena, see National Forensic Laboratory Information System 2010 National Report (Drug Enforcement Administration Office of Diversion Control) at 9 (in 2010, only 0.41% [or only 1 out of 250] of the 1.5 million drug

---

[1] After an extended investigation by the Massachusetts Attorney General's Office, Annie Dookhan pled guilty to numerous charges including 1 count of perjury, 4 counts of misleading an investigation, 8 counts of tampering with evidence and 1 count of making a false claim to holding a degree. See November 22, 2013 Plea Hearing at 7-8 (attached as Exhibit 1).   At Doohkan's plea colloquy, the lead prosecutor indicated that, following the takeover of the lab by the Massachusetts State Police in July, 2012, an investigation was initiated into Dookhan's practices at the lab that included a series of retesting on samples that had been submitted to the mass spectrometer more than once. Id. at 11.   The retesting identified *six* instances where Dookhan tampered with the testing vials submitted to the mass spectrometer for confirmatory testing.   Id. Investigators also identified one instance in which Dookhan had tampered with a discovery packet by including a report for a test she had never run, 14 instances in which she falsely testified that she had a Master's Degree in Chemistry, and one case in which she falsely testified both that she has a Master's Degree and testified that she was in charge of quality control at the JP Lab.   Id. at 12-13.

exhibits submitted for laboratory analysis to participating facilities nationwide contained no narcotic or controlled substance) (attached as Exhibit 2),[2] and because the record here shows that, no matter how much hyperbole is made regarding Dookhan, the defendant has absolutely no evidence that the drugs in this case were anything other than cocaine.

There is no claim of actual innocence raised in this case (i.e., Theodore Gamble has never stated that the drugs he peddled or the additional drugs he possessed on August 27, 2010 were not cocaine). Nor is there any evidence here that Dookhan or anyone else adulterated the drugs he sold to a BPD UC on August 27, 2010.   In fact, the record conclusively shows that the drugs in this case are cocaine, exactly what the government charged and exactly what Gamble admitted they were when he pled at his Rule 11 Hearing. Hence, while the Motion to Vacate included voluminous materials about the Dookhan scandal, none of it--not one page--is about the specifics of the testing done here.[3]

Thus, there are many things that the Annie Dookhan/DPH scandal is not.   Such as a "get out of jail free card" for any defendant whose drugs Dookhan touched.   This is particularly so for Gamble, who admitted under oath before this Court that he knew the substance that he distributed on August 27, 2010 was cocaine and successfully argued for a sentence substantially under the low end of the advisory guideline range based in part on his acceptance of responsibility.   See Gamble Rule 11 Hearing (8/4/11) at 9 (guilty plea) (attached as Exhibit 3); Sentencing Tr. (10/6/11) (attached as

---

[2] Numbers for the Northeast were even lower, at 0.37%.   Id.

[3] The best the defendant can do here is to make broad generalizations about the JP Lab and case specific arguments that are just not supported by the record.   See Supplemental Memorandum at 3 (arguing that the certification in this case was "at best unreliable and more accurately probably fraudulent" without any reference to the actual testing documents.   Moreover, Gamble's claim that the certification was "in no way cumulative of other evidence (see Supplemental Memo at 2) ignores the positive field test conducted on the day of Gamble's arrest, the manner in which he conducted the sale and statements he made and of course the sworn statements in his Rule 11 hearing.   All of this is discussed at pages 4-6 (discussion of undisputed facts surrounding charged drug transaction) and 7-9 (specifics of Gamble's August 4, 2011 Rule 11 Hearing.

Exhibit 11) at 40-49 (Gamble's allocution and Court's imposition of sentence).   For that reason alone, the Motion to Vacate should be denied.

But there is much more evidence showing that the reason Gamble admitted to dealing cocaine was that the drugs the Boston Police bought from him were cocaine.   That evidence includes the fact that drugs purchased by the UC field tested positive for cocaine and that all 4 bags were inspected and determined both to be crack cocaine. See Affidavit of BPD Sgt. Det. Donald Keenan (August 31, 2010) (attached as Exhibit 4); Incident Report (attached as Exhibit 5).   It also comes from the drug exhibits in this case, which included 3 bags of cocaine never opened or tested at the JP Lab but which were determined to be crack cocaine when additional testing was done on the unopened bags by State Police Chemists in Sudbury.   See Supplemental Boston Police Incident Report dated 11/13/12 and photographs attached as Exhibit 6 (detailing retrieval and photographing of drug exhibits at Boston Police Drug Depository that included at least two bags of crack that appeared to be unopened); December 14, 2012 Massachusetts State Police Drug Certification and Chemist's Notes (attached as Exhibit 7) (certifying that three bags tested—all of which the chemist indicated "appears intact unopened" were cocaine, thus confirming the results reached by the JP Lab in its original testing).   See also JP Lab Certification B10-10224 (attached as Exhibit 8-1).

Any one of these circumstances undercuts the heavy burden Gamble bears here.   E.g., Singleton v. United States, 26 F.3d 233, 236 (1st Cir. 1994) ("post-conviction relief on collateral review is an extraordinary remedy, available only on a sufficient showing of fundamental unfairness"); United States v. Wilkins, 2014 WL 2462554, *2 (1st Cir.2014 (in affirming denial of 2255 Petition on JP Lab grounds, First Circuit noted that a defendant seeking to vacate a guilty plea faces "an arduous trek" because, "as a general matter, a voluntary and intelligent plea of guilty made by an accused person who has been advised by competent counsel may not be collaterally

attacked")(internal quotations and citations omitted).   Taken together, these undisputed facts

require that the Petition be summarily dismissed. E.g., Moreno-Morales v. United States, 334 F.3d

140, 145 (1st Cir. 1998) ("[e]videntiary hearings on 2255 petitions are the exception, not the norm,

and there is a heavy burden on the petitioner to demonstrate that an evidentiary hearing is

warranted."); United States v. DiCarlo, 575 F.2d 952, 954 (1st Cir. 1978) (summary dismissal of

2255 petition is appropriate where it "(1) is inadequate on its face; or, (2) although facially adequate,

is conclusively refuted as to the alleged facts by the files and records of the case").

## FACTS[4]

### A.   The August 27, 2010 Purchase of Cocaine from Theodore Gamble by a Boston Police Undercover Officer equipped with a Video Camera

The investigation that brought Theodore Gamble to this Court was part of an ongoing effort

to blunt drug trafficking in and around the area of the Bromley Heath Housing Development in

Jamaica Plain.   The Drug Control Unit ("DCU") from the Boston Police Department's ("BPD")

District D-4 had come from its usual base of operations in the South End i to attack drug trafficking

that plagues Bromley Heath and its residents.

Activity in these operations took place on August 27, 2010 after officers from the D-4/E-13

DCUs had obtained the telephone number of a crack dealer going by the name of "BEAR" and using

857-417-5299. Complaint   (Exhibit 4) at ¶ 8. This individual, of course, turned out to be Gamble, a

long time Bromley Heath resident. PSR at ¶¶ 10, 72.

An undercover officer (the "UC") called the number and was eventually successful in

speaking to Gamble and arranging for the purchase of $80 of crack cocaine in the area of the Jackson

---

[4]   Facts set forth herein are taken from the un-objected to provisions of the Presentence Report attached as Exhibit 9 ("the PSR"), from Gamble's own words at his Rule 11 Hearing and Sentencing, and from the other exhibits appended to this Opposition.

Square MBTA station.   Gamble instructed the UC to call him again once the UC was in that area and to "hurry up."   The UC was provided with $80 in previously recorded U.S. currency and a video recording device that captured visual images but no sound. PSR at ¶¶ 11-12.

Once in the Jackson Square area, the UC called Gamble and told him that he was at the "meet spot."   Gamble asked the UC what he was wearing and the UC provided his description. Id at ¶ 13.

Gamble then instructed the UC to walk to the stairs located just beyond the basketball court. The UC complied, approached Gamble and had a brief conversation with him.   Gamble then turned his back to the UC, reached into his waist area,   and placed 4 plastic bags of crack cocaine on the wall next to 10 Lamartine Street Extension (the Anna M. Cole Community Center). Gamble then turned to the UC and requested the money. Id.

The UC handed Gamble $80 and retrieved the 4 plastic bags of crack cocaine from the wall. The UC thanked Gamble and asked Gamble if he could call him again in the future.   Gamble agreed that the UC could call him again and stated that his stuff (the crack cocaine) was "fire." PSR at ¶14.

The UC then left Gamble and alerted surveillance that the deal was complete.   As he did so, Gamble walked deeper into Bromley Heath.   The UC watched Gamble meet with a man identified as Jiwan Battiste (who was on federal supervised release from a federal drug investigation done at Heath Street in 2006), and an unidentified female. PSR at ¶ 15.

Officers approached Gamble and placed him under arrest.   Officers advised Gamble of his Miranda rights and recovered a cellular telephone and $152 .   When the officers examined Gamble's cash, he told them: "You ain't gonna find the marked money in there." PSR at ¶ 16.

Battiste was approached and searched for the buy money as well with negative results.   The black female had left the area before the officers arrived and presumably had the buy money with her.   The $80 in buy money was never recovered. PSR at ¶17. Hence, the record shows that Gamble

5

had managed to get rid of the buy money minutes after the sale he admitted to making had been completed and was only carrying around the drugs that he needed for this specific sale.

The UC came to the scene and positively identified Gamble as the person that just sold him crack cocaine.   While being placed into the cruiser, Gamble said "Why you arresting me, I got no marked money."   Gamble was then brought to District E-13 to be booked.   During the booking search, Gamble told Officer Green that the cellular telephone that was seized from Gamble's hand was not his telephone.   A review of the recent telephone calls from that telephone revealed that it had been in contact with the UC's cellular telephone. PSR at ¶ 18.

Officers thereafter inspected the drugs sold to the UC by Gamble and identified them as crack cocaine.   PSR at ¶ 19.   See also United States v. Brown, 450 F.3d 76, 80-81 (1st Cir. 2006) ( "[C]rack is . . . uniquely identified by its "rock-like" texture and yellowish or off-white color…. Lay opinion as to the appearance of a substance to this effect may be used to prove that the substance is crack"). One of the four plastic bags of crack cocaine purchased from Gamble was field tested positive for cocaine base. Incident Report (Exhibit 5) at 3   The drugs were then sent to the JP Lab, which tested one of the 4 bags and determined that it contained .12 grams of cocaine. PSR at ¶19.

Gamble was arrested on his federal warrant on August 31, 2010, also at the Bromley Heath Housing Project and was found to be in possession of a scale and receipts for two cellular telephones that he attempted to eat to keep them away from the police.   Gamble resisted police after a strip search was authorized and police found bags of marijuana hidden in his underwear. PSR at ¶21.

**B.   The Issuance of DPH Drug Certifications**

On November 29, 2010, the JP Lab issued final certifications indicating that the drugs purchased from the Gamble tested positive for cocaine.   The lab tested 1 of the 4 bags purchased by the UC and determined that it was .12 grams of cocaine.   See Certification No. B10-10224, (Exhibit

6

8-1).   This left 3 untested bags from the drugs the UC purchased.[5]

## C.   The Prosecution of Gamble and his Rule 11 Hearing

Gamble was thereafter charged with distribution of cocaine within 1000 feet of a playground in violation of 21 U.S.C. § 841 and 860.   See Complaint attached as Exhibit 4.   Gamble contested both probable cause and detention, but has never claimed that the drugs sold to the UC on August 27, 2010 were anything other than cocaine.

Gamble pled guilty on August 4, 2011.   See Rule 11 Tr. (attached as Exhibit 3).   During his plea colloquy, this Court made it exquisitely clear that the charge against Gamble required the government to prove that he knowingly and intentionally distributed cocaine to the undercover officer on August 27, 2010:

> THE COURT: Do you understand that to prove that crime the government would have to prove beyond a reasonable doubt that on the date alleged you possessed cocaine, that you did so with the intent to distribute it, that is, transfer it to someone else, that you did that knowing it was cocaine and intending to transfer it to somebody else, and at the time you possessed the cocaine or the time you transferred it, as alleged, you were within 1,000 feet of a playground?

> THE DEFENDANT: Yes.

> THE COURT: And the specific charge here is that on or about August 27, 2010, in Boston, Massachusetts, you did knowingly and intentionally possessed with intent to distribute and did distribute cocaine and that the crime was committed by you within 1,000

---

[5] As set forth above, Gamble has been provided, not only with this certification, but with the backup documentation from the JP Lab evidencing the testing of the drugs. With one exception, no mention of them (or any other aspect of the testing in *this* case) has been made.   Gamble has argued that JP Lab chemists concealed instances in which there were discrepancies between initial and confirmatory testing by not producing the back of the control card in which multiple runs of confirmatory testing on the Gas Chromatograph/Mass Spectrometer ("GC/MS") were noted. See Motion to Vacate at 9-10 ("The only place that a discrepancy between the primary chemist's result and confirmatory GC/MS testing might be noted was on the back of an index card known as the 'control card.'   However, the chemists… only transmitted the *fronts* of the cards in   the discovery packet").   Here, the government produced both sides of the control cards, which show that the confirmatory testing done on the GC/MS was done only once.   See Exhibit 8 pages 3-4 (both sides of the JP Lab control card for Sample No. B10-10224).

feet of a playground, particularly the Southwest Corridor Park in Jamaica Plain?

THE DEFENDANT:  Yes

THE COURT: Did you commit that crime?

THE DEFENDANT:  Yes.

THE COURT: Now I'd like you to listen while Mr. Wortmann summarizes what the government's evidence would have been if we went to trial and then I'm going to ask if you agree with his summary of what you did.

MR. WORTMANN:   Thank you, your Honor. Your Honor, if the case proceeded to trial the government would prove all the elements of the indictment beyond a reasonable doubt. The government's evidence would show that on the afternoon of August 27, 2010, officers from the Boston Police Department's District D-4 Drug Unit were in the Bromley Heath area conducting undercover drug operations.   Before going in that day they obtained the telephone number of someone who's alleged to be a local dealer going by the name of "Bear" and who was using number 857-417-5299.   When the officer got into the area of the Bromley Heath housing project they called that number and he was successful in speaking to Mr. Gamble and arranging for the purchase of $80 of cocaine in the area of the Jackson Square T-station.   Mr. Gamble told the undercover to call him when he got to the T-station and told him that he should hurry up. The undercover was then provided with $80 in buy money and a video recording device that had no audio capabilities.

Once in the Jackson Square area the undercover called Mr. Gamble who told him, um -- asked him what he was wearing and got the description and then told him to walk out past the T-station, down across Southwest Park to the area beyond the basketball courts.   The UC did exactly as Mr. Gamble instructed, saw Mr. Gamble standing next to a wall near the Community Center. He approached him, they had some conversation, Mr. Gamble turned around, went to his waist, placed four bags of what appeared to be crack cocaine on the wall, then turned around and took the money from the undercover officer. The undercover officer thanked him, asked him if he could call him again, collected the drugs, and the two men parted. And the drugs were sent to the state laboratory which would certify that it was cocaine and the video demonstrated that it was Mr. Gamble. The undercover's phone number was also found on the phone that Mr. Gamble had at arrest. And the video shows that the deal took place within 1,000 feet of the Southwest Corridor Park, which includes a number of basketball courts, a tennis court, and a tot lot that contains swings, um, three of them were apparatus intended for the recreation of children.

And that would be the evidence in support of Count 1.

THE COURT: All right. Do you agree with the government's summary of what you did?

THE DEFENDANT:  Yes.

THE COURT: And how do you now wish to plead,  guilty or not guilty?

THE DEFENDANT:  Guilty.

THE COURT: Then I'll accept your guilty plea and direct the Clerk to enter it because I find you are competent, you're acting knowingly and voluntarily, you're effectively represented, and there's an independent basis in fact to support your plea. You may take your seat back at the table.

Rule 11 Hearing (August 4, 2011)(Exhibit 3) at 10-14.

## D.  Sentencing

Theodore Gamble was sentenced on October 6, 2011. Docket (October 6, 2011). That sentencing took place only after the defendant had been interviewed by Probation, had the opportunity to review and object to the PSR, and after a sentencing memoranda was filed detailing the mitigating factors that Gamble believed supported the 30% variance ultimately granted by the Court in sentencing Gamble to 18 months in prison.[6]   Sentencing Tr. (attached as Exhibit 11).

The sentencing here has importance here for several reasons.   The first is that Gamble did not object to any aspect of the offense conduct, meaning that he once again admitted to the government's description of how he effected the sale of cocaine to the undercover that was charged in the Indictment.   See PSR (Exhibit 9) at pp. 34-35 (Objections limited to issue of Gamble's purported gang association; did not object to the government's description or that he told the UC that his [Gamble's] "shit was fire").   The second is that Gamble was no stranger to drugs and drug trafficking.   See PSR at ¶ 48 (2003 incident in which two "large plastic bags of crack cocaine" were recovered from area where defendant was sitting and defendant was found to be in possession of $712 in cash and a bag of marijuana).   See also PSR at ¶ 97 (Gamble admitted to smoking up to 50 marijuana joints per day between the ages of 11 and 25). Nor was there any explanation in the

---

[6] Compare PSR at ¶ 120 (calculating advisory guideline range to be 27-33 months). Had Gamble not pled, the range would have been 33-41 months.

PSR (or anywhere else) as to how Gamble financed his extensive drug use. Id. ¶ 108 (Defendant

admitted to having no employment history since he was a teenager and no income other than

intermittent disability payments that did not begin until 2008 and were then cut off when he was

incarcerated in January, 2009). All of this shows that Gamble was no stranger to drugs (causing

defense counsel to request that Gamble be drug tested while on supervised release) and thus had

good reason to know that the substance he was peddling was cocaine.

**E.   Additional Testing Preformed by the State Police Crime Lab**

Following revelations about Dookhan's misconduct at the JP Lab, the government undertook

to obtain additional drug testing on the three previously untested bags purchased from Gamble on

August 27, 2010.   As set forth above, the DPH Drug certifications made clear that the only testing

done by it on this case was on one of the four bags purchased, meaning that other bags had not been

tested. See Exhibit 8 (JP Lab certification states that "4 items were received and 1 was selected and

analyzed").

The first step in this additional testing was to get the drugs from the BPD Drug Depository

(where they were stored once testing at the DPH Lab was completed) to the State Police Crime Lab

in Sudbury.   That was accomplished on November 13, 2012 by the UC and other members of the

D-4 DCU, all of whom participated in the August 27, 2010 undercover purchase and arrest of

Gamble.   See Exhibits 5 (Original Incident Report) and 6 (Supplemental Report dated 11/13/12).

The officers obtained the drugs from the BPD Drug Depository where they had been held

following the completion of testing by the DPH Lab.   The drugs were contained in heat sealed bags

kept in a manila folder marked with the BPD Incident Number.   See Supplemental Incident Report

Exhibit 6 at page 2.   Det. Walsh also photographed the two heat-sealed bags in which the drug

exhibits were stored.   These photographs show the note that Sgt. Det. Keenan placed in the sealed

exhibit bag on August 27, 2010 after he had field tested the drugs that identified the date
("8-27-10"), the BPD Central Complaint number for this case ("CC#100465162"), that the contents
of the bag were "4 p/b's sold to UC Stoddard by Theodore Gamble," and that "1 of the 4 field tested
positive for cocaine." See Exhibit 6 Supplemental report referencing Keenan's note) and
photographs 2 and 3 (showing the note itself). Walsh also stated in his report that, based on the visual
inspection of the sealed bag containing the drugs (the officers did not open the sealed evidence bag
while inspecting and photographing it at the Drug Depository in order to presser e the chain of
custody), there were 2 "plastic bags of crack cocaine that still have the plastic bags knotted tightly
and do not appear to have been opened." Exhibit 6 at 2.   Photographs taken by Det. Walsh that day
also confirm his observations (see Exhibit 6, photographs 2-3) Id.

The drugs were thereafter sent to the State Police Crime Lab for further testing.   Chemists
there (who of course did to open up the exhibit to test the contents of the three untested bags)
determined that there were in fact three bags that "appear[ed] intact/original" and that the contents of
those bags were cocaine base, a/k/a "crack cocaine" based on tests using Ultraviolet Spectrometry,
Fourier Transform Infrared Spectrometry and Gas Chromatography/Mass Spectrometry.   See
Exhibit 7, Drug Analysis and Certification (chemist's notes regarding "original"..."intact" bags).

## THE LAW

Gamble filed his Motion to Vacate only after his conviction had become final and it is
cognizable (if at all) only under 28 U.S.C. §2255.   It is therefore appropriate to consider principles
governing withdrawal of pleas under 28 U.S.C. §2255 as well as a settled cases recognizing that drug
identity can be proven circumstantially in the absence of any laboratory analysis.   When applied to
the record in this case, these principles show that the 2255 should be summarily dismissed.   See
United States v. Wilkins, 943 F.Supp.2d 248, (D.Mass.2013)(Stearns J.)(summarily dismissing

2255 brought by defendants who sold drugs to District D-4 DCU undercover officer), affirmed, ---

F.3d ----, 2014 WL 2462554 and --- F.3d ----, 2014 WL 2696723 (1st Cir. 2014).[7]

## A.  Legal Standards under 28 U.S.C. §2255

Section 2255, Title 28, United States Code, provides a means for collateral attack after a

conviction has become final.   United States v. Haymen, 342 U.S. 205 (1952).   The law is

"well-settled" that "to obtain collateral relief a prisoner must clear a significantly higher hurdle than

would exist on direct appeal."   United States v. Frady, 456 U.S. 152, 166 (1982).   "A presumption

of finality attaches to criminal convictions once all direct appeals have been exhausted." Singleton v.

United States, 26 F.3d 233, 236 (1st Cir. 1994).   See also Barefoot v. Estelle, 463 U.S. 880 (1983).

For relief to lie under § 2255, an error must be jurisdictional, constitutional, "a fundamental

defect which inherently results in a complete miscarriage of justice", or "an omission inconsistent

with the rudimentary demands of fair procedure."   United States v. Addonizio, 442 U.S. 178, 185

(1979); Hill v. United States, 368 U.S. 424, 428 (1962).   Simply put, "post-conviction relief on

collateral review is an extraordinary remedy, available only on a sufficient showing of fundamental

unfairness."   Singleton, 26 F.3d at 236; See also Brecht v. Abrahamson, 507 U.S. 619, 632 (1993).

---

7  The First Circuit decisions in Wilkins and Merritt have real significance here.   Like the present
case, both Petitioners there sought to set aside their sentences despite the absence of any evidence of
irregularities in the specific testing done in their case,  E.g., Wilkins, 2014 WL 2462554, *2,
("Although there was no direct evidence that Dookhan had committed any transgressions with
respect to this case, the petitioner moved to set aside his conviction and vacate his guilty plea based
on the scandal").   Moreover, both Wilkins and Merritt sought relief in the face of significant
circumstantial evidence regarding drug identity (including, among other things positive field tests,
conduct taken during the charged sale and clear Rule 11 admissions by both) comparable to that
here. Id. at 4 (describing "powerful circumstantial evidence").   In affirming the denial of the
petitions in Wilkins and Merritt, the First Circuit also recognized the importance of post-conviction
testing identical to that done here and that Petitioners in JP Lab cases will bear the burden of proving
their case without the benefit any per se rule of prejudice like that adopted by the Massachusetts
Supreme Judicial Court in Commonwealth v. Scott, 5 N.E. 2d 530 (Mass. 2014).   See Wilkins, 2014
WL at *5 ("This case is a horse of a different hue, and the Scott prohibition has no bearing here").

The First Circuit has permitted 2255 Petitioners to withdraw guilty pleas only in extraordinary circumstances. Specifically, a defendant seeking to withdraw his guilty plea after his conviction becomes final must show that the plea proceedings were marred by "a fundamental defect which inherently results in a complete miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure." United States v. Carrington, 96 F.3d 1, 5 (1st Cir. 1996). This requires a two-part showing: first, some "egregiously impermissible conduct (say threats, blatant misrepresentations, or untoward blandishments by government agents) that antedated the entry of the plea"; and second, a reasonable probability that but for the misconduct, the Petitioner would have insisted on going to trial.   Ferrara v. United States, 456 F.3d 278, 290-294 (1st Cir. 2006) (allowing Petitioner to withdraw plea where government engaged in "blatant misconduct" by withholding exculpatory information and making affirmative misrepresentations sufficiently outrageous so as to support a claim that plea was involuntary).   In assessing the prejudice element, a court is required both to use an objective lens and consider the totality of the circumstances. Id.   See also Brady v. United States, 397 U.S. 753, 757 (1970)(" We find no requirement in the Constitution that a defendant must be permitted to disown his solemn admissions in open court that he committed the act with which he is charged simply because it later develops that the State would have had a weaker case than the defendant had thought. . ..").

## B.   Circumstantial Proof of Drug Identity

As relevant as the foregoing principles are, a second body of law may be more important in resolving the present motion: the extent to which the government can prove drug identity even in the absence of a laboratory analysis.   The ability of the government to prove that Gamble was peddling cocaine even if the drugs had never been in the JP Lab provides the context in which the motion to vacate and any claim of prejudice must be viewed.   See Ferrara, 456 F.3d at 291 (in assessing

13

whether alleged misconduct supported Petition, court noted that "everything depends on context").

"As a general matter, '[i]dentification of a controlled substance does not require direct evidence if available circumstantial evidence establishes its identity beyond a reasonable doubt.' Proof based on scientific analysis or expert testimony is not required to prove the illicit nature of a substance, and identification of a substance as a drug may be based on the opinion of a knowledgeable lay person." Waters, 904 F.2d at 768 (testimony of defendant's acquaintances sufficient to establish that the substance he sold from his apartment was cocaine). See also United States v. Valencia-Lucena, 925 F.2d 506, 512 (1st Cir. 1991) (unnecessary to perform lab analysis or introduce cocaine into evidence where circumstantial evidence was sufficient); United States v. Paiva, 892 F.2d 148 (1st Cir. 1989) (upholding sufficiency of evidence based on testimony of detective who conducted field test and testimony of lay person that drug was cocaine).

## C.  <u>The Defendant's Arguments</u>

Of course, these principles take on meaning only in the context of the arguments actually raised in support of the Motion to Vacate.  And there appear to be two.  They include that the undersigned improperly failed to disclose Dookhan's general misconduct in violation of his Brady obligations and that the failure to make those disclosures also voided Gamble's plea under Ferrara v. United States, 456 F.3d 278 (1st Cir. 2006).  Gamble makes these arguments without a shred of evidence that the United States Attorney's Office had any notice of misconduct by Annie Dookhan before his plea or sentencing. These arguments have also already been rejected in two decisions authored by Judge Stearns, one of which has already been affirmed by the First Circuit. See Wilkins, 943 F.Supp.2d at 248; United States v. Smith, 2013 WL 6798931 (D. Mass. 2013).

There are at least two notable aspects of the Motion to Vacate filed on Gamble's behalf. The first is the absence of anything suggesting that Gamble is actually innocent of the charges to

which he pled guilty.   Despite ample opportunities to file an affidavit claiming that he knew the charged drugs were counterfeit substances, offering some explanation as to why he would have lied to the Court at his Rule 11 hearing about his knowledge that the substance he was peddling was cocaine, to seek to vacate his plea before the conviction became final, or even objecting to the provisions of his Presentence Reports that stated the substances sold were cocaine, the defendant has made absolutely no claim that he is innocent.   While this is not dispositive, even a cursory review of the applicable law shows how significant this failure is. E.g., Schlup v. Delo, 513 U.S. 298, 324 (1995) (to present a credible claim of actual innocence, petitioner must "support his allegations of constitutional error with new reliable evidence whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence that was not presented at trial"); Wilkins, 2014 WL 2462554, *5 (after recognizing the general significance of a Rule 11 admission, the First Circuit noted that, "such an admission is especially compelling because the petitioner neither attempts to explain it away nor makes any assertion of actual innocence"); United States v. Sousa, 468 F.3d 42, 46 (1st Cir. 2006)(affirming denial of motion to vacate guilty plea where defendant made no claim of actual innocence); United States v. Torres-Rosario, 447 F.3d 61 (1st Cir. 2006) (Defendant not entitled to withdraw guilty plea to drug offense, where he did not claim actual innocence and defendant affirmatively agreed to the drug amounts during Rule 11 colloquy); United States v. Bryant, 557 F.3d 489, 496 (7th Cir. 2009) (affirming denial of defendant's pre-sentence motion to set aside his plea based on newly-discovered evidence that DEA chemist had mishandled drug samples during time period in which he evaluated the evidence in his case because, inter alia, "[t]he evidence and legal arguments that Mr. Bryant relied upon in his motion at best relate to the strength of the Government's case against him, not his factual innocence.").

It is equally significant that Gamble offers nothing, other than the repeated mantra of

"Dookhan...Dookhan...Dookhan," to suggest that there was a single flaw in any of the drug testing in this case.   Although the defendant has been provided with the certification and back up from the JP Lab tests, with all of the documents regarding the additional testing done by an independent chemist at the State Police Crime Lab in 2013, and was made aware of all the other evidence showing that the charged drugs are in fact cocaine since the beginning of the case back in 2010, he has failed to offer anything to show that the drugs in this case were adulterated, improperly tested, subject to any manipulation, or were anything other than cocaine.   The defendant has thus simply failed to meet his very heavy burden in seeking to vacate his plea under 28 U.S.C. §2255. E.g., Miranda-Gonzales v. United States, 181 F.3d 164, 165 (1st Cir. 1999)("A defendant who pleads guilty to an offense and later attempts to wipe the slate clean bears a heavy burden. . . ."); Singleton v. United States, 26 F.3d 233, 236 (1st Cir. 1994)("post-conviction relief on collateral review is an extraordinary remedy, available only on a sufficient showing of fundamental unfairness").

## 1. Gamble's Rule 11 Admissions Require that the Motion Be Denied

Consideration of Gamble's arguments begins (and indeed should end) with the admissions he made at his Rule 11 Hearing that the drugs he sold were cocaine. Rule 11 Tr. (Exhibit 3) at 10-14. Having made these admissions under oath, Gamble should not be entitled to walk away from them now.   E.g., Blackledge v. Allison, 431 U.S. 63, 74 (1977)("A defendant's sworn statements in open court "carry a strong presumption of verity" because courts must be able to rely on a properly conducted Rule 11 hearing"); Miranda-Gonzales v. United States, 181 F.3d 164, 165 (1st Cir. 1999)("A defendant who pleads guilty to an offense and later attempts to wipe the slate clean bears a heavy burden. . . .").   Gamble's background and experience show that he knew what he was talking about when he pled guilty admitting under oath that the substance he sold to the UC was cocaine. E.g., United States v. Oliver, 468 F.Supp.2d 980, 985 (C.D. Ill. 2007)(" the "experts" on whether

16

cocaine base is crack are crack dealers, crack users and experienced drug agents familiar with crack

on the street); <u>Paiva</u>, 892 F.2d at 157 ("Although a drug user may not qualify as an expert, he or she

may still be competent, based on past experience and personal knowledge and observation, to

express an opinion as a lay witness that a particular substance perceived was cocaine or some other

drug"). The fact that Gamble has never disputed that the drugs in this case were cocaine only adds to

the force of his Rule 11 admissions.   See <u>United States v. Merritt</u>, 2014 2696723 (1st Cir. 2014)(in

affirming dismissal of 2255 Petition based on identical JP Lab issues, the First Circuit noted that:

"[T]he appellant has never maintained that this counterfeit drugs scenario (or for that matter any

other exonerative tale) has any grounding in reality. To the contrary, the appellant admitted his

factual guilt at the change-of-plea hearing—an admission from which he has never retreated. *Such a*

*set of circumstances militates powerfully against reversing a trial court's denial of a*

*plea-withdrawal motion.*") (emphasis supplied).

### 2.   <u>Corroborating Evidence of Drug Identity</u>

Gamble's knowledge that the substance he was selling was cocaine is also clear from other

facts leading up to and surrounding his arrest. When the UC initially called Gamble using the phone

number that was associated with a dealer identified only as "Bear" but who turned out to be Gamble,

the UC arranged to make a purchase of $80 of "crack cocaine."   PSR at ¶11.   Although Gamble

initially told the UC to go to the Jackson Square MBTA Station, he subsequently changed the

location to a more remote area located on the Southwest Corridor (a common tactic designed to

detect police surveillance).   Once there, Gamble did not hand the drugs to the UC but put 4 $20 bags

of crack cocaine on a wall where the UC could pick them up, apparently under the misguided belief

that this would prohibit him from being found guilty of "distribution." Once Gamble had gotten the

money, he agreed to do additional deals with the UC (who as noted above already had Gamble's

number) and bragged that his "shit" was "fire." PSR at ¶ 14.   All of this, when combined with the

positive field test, the identification of the substance purchased from Gamble as crack cocaine by

experienced drug investigators, and the results of the testing at the State Police Lab, shows this 2255

to be baseless.   E.g., United States v. Marshall, 985 F.2d 901, 905 (7th Cir. 1993) (evidence

"regarding the purchase price of the substance, the covert actions related to the substance, and the

witnesses' familiarity with cocaine constitutes proper circumstances on which the identity of a

controlled substance may be established"); United States v. Stewart, 2006 WL 1222340 (3rd Cir.

2006) (upholding conviction based on lay testimony of the drug's "physical appearance", the price

paid, the covert manner in which the transactions were carried out, the manner in which it was

transported to avoid detection, and the fact that [the defendant] and others called the substance

cocaine"); United States v. Coleman, 179 F.3d 1056, 1060 (7th Cir. 1999) (field test coupled with

circumstantial evidence that substance was cocaine sufficient to sustain conviction).

Moreover, this court should also pay particular attention to the fact that Gamble was dealing

in his own backyard and encouraged the UC to call him to do more deals in the future.   His actions

simply make no sense if the substance he was peddling was counterfeit given the obvious interest

that a cheated buyer would have to find Gamble to get back his money or obtain real drugs.   See

United States v. Wilkins, 943 F. Supp. 2d 248 (D. Mass. 2013) (in denying comparable motion to

that at issue here, Judge Stearns noted that, "[t]he speculation that defendants might have been

engaged in the sham street sale of counterfeit drugs is barely within the rim of the remotely possible.

While episodic sales of counterfeit drugs are not unknown, at a street level, where sales are repetitive

and customers are demanding about the quality of what they purchase, any sale of a sham drug is

extremely dangerous to an established dealer.")

### 3.  Any Brady v. Maryland Claim fails

Under familiar law, Gamble can be entitled to relief under Brady only if he establishes: (1) the evidence is material and favorable to the defense; (2) the prosecution suppressed the evidence; and, (3) the defendant was prejudiced.   United States v. Turner, 501 F.3d 59, 73 (1st Cir. 2007), cert. denied, 128 S.Ct. 1473 (2008).   Accord, United States v. Rivera-Rangel, 396 F.3d 476, 485 (1st Cir. 2005).   Because Gamble has failed to satisfy any of these elements, his argument fails.

   **(a) There is no prejudice.** To show prejudice, Gamble must establish that there is a reasonable probability that, had the evidence of the Dookhan misconduct been disclosed to the defense, the result of the proceeding would have been different.   In assessing prejudice, the Court is required to use an objective lens and to consider the totality of the circumstances. Ferrara v. United States, 456 F.3d 278, 290-294 (1st Cir. 2006).

   The futility of Gamble's prejudice claim comes from two basic failings.   The first is his inability to show that Dookhan's misconduct had any effect on the testing done in this case or his plea.   As set forth above, there is nothing in the record that shows that the testing in this case was flawed in any respect.   Gamble has been provided with thousands of pages of JP Lab discovery, including all of the JP Lab back up material for the testing here.   Yet, he has produced nothing to suggest that testing here was flawed or that otherwise satisfies his "heavy" burden of proof.

   **(b)   There is no innocence.** Gamble also makes no claim of actual innocence.   As Judge Stearns recognized in Wilkins:

> Here, neither Merritt nor Wilkins makes a claim of actual innocence. Thus, any impeaching material regarding Dookhan's mishandling of the evidence in theirs or other cases would only be relevant at trial to the extent that it might be used to challenge the chain of custody of the drugs at issue, or possibly to impeach the efforts of the substitute chemist to repair the damage done by Dookhan. Neither of these purposes, as Ruiz makes clear, has any relevance to the validity of defendants' guilty pleas. See Ruiz, 536 U.S. at 630 122 S.Ct. 2450 (the Constitution "does not require complete knowledge of the relevant circumstances but permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite

> various forms of misapprehension under which a defendant might labor"); <u>Ferrara v. United States</u>, 456 F.3d 278, 291 (1st Cir.2006) ("Even if a defendant's misapprehension of the strength of the government's case induces him to throw in the towel, that misapprehension, standing alone, cannot form the basis for a finding of involuntariness."). In sum, the rule of <u>Brady v. Maryland</u> offers defendants no relief.

943 F. Supp. 2d at 255-56. It is also obvious that, had the government known about Dookhan's misdeeds at the time this case was pending, it simply would have had the drugs (in the three original intact bags) retested by another chemist, thereby limiting the import of Dookhan, particularly in view of the positive field test, the manner in which the drug deal was conducted and statements and actions that Gamble himself took. <u>See</u> <u>Ferrara</u>, 456 F.3d at 294 (whether the sequestered evidence could have been used to impeach a witness whose credibility may have been outcome determinative is a relevant factor in determining whether the defendant can satisfy prejudice requirement).[8] Because Gamble has failed to show that disclosure of Dookhan's misdeeds in other cases, viewed through the required objective lens, would have changed his decision to plead, any <u>Brady</u> claim fails. <u>E.g.</u>, <u>United States v. Olsen</u>, 704 F.3d 1172, 1184–1185 (9th Cir.2013) (finding no <u>Brady v. Maryland</u> violation where the prosecution did not inform defendant that a forensic scientist who handled evidence and testified as to the chain of custody had been the subject of a state investigation for contamination of samples and perjury because there was no reasonable probability

---

[8] <u>See also</u> <u>United States v. Johnson</u>, 519 F.3d 478, 489 (D.C. Cir. 2008) (in determining whether disclosure of impeachment evidence would have yielded a different outcome at trial, the court must consider the "range of predictable impacts on trial strategy"; "[w]hen the government has other qualified witnesses to prove its case, we cannot assume that it would have foolishly charged ahead, blindly offering the compromised witness and exposing itself to his inevitable demotion on cross…In such cases, nondisclosure would not be material in *Brady* terms.") (internal markings omitted), <u>citing</u> <u>United States v. Gale,</u> 314 F.3d 1, 4 (D.C. Cir.), *rehearing denied*, 326 F.3d 228 (2003) (if government had known of impeaching evidence concerning expert witness, it would have called a different witness); and <u>United States v. Matthews</u>, 168 F.3d 1234, 1243 (11th Cir. 1999) (if internal investigation of testifying detective had been disclosed, it is unlikely the government would have used that testimony).

that the verdict would have been different had the evidence been disclosed to the jury); Ritchey v. Johnson, 1996 WL 457319 (5th Cir.1996) (denying defendant's habeas petition alleging constitutional error where a serologist had falsified samples in other cases given that defendant had "not shown how any such evidence could have implicated the voluntariness of his plea"); United States v. Williams, 985 F.2d 749, 752-57 (5th Cir. 1993)(denying post-conviction relief based on claim of a break in the chain of custody caused by a forensic chemist who "had pilfered drugs from the lab's disposal file for personal use" in other cases when the record provided "no reason to believe" the chemist actually tampered with the applicant's drug exhibit, the defendant made furtive movements, drugs field tested positive, and the scientist's conclusion was confirmed via reanalysis).

(c)   **Dookhan was never part of the "prosecution team."**   There is a another flaw with any Brady claim because, as the record makes clear, no information about Dookhan's misdeeds was known by the government at the time of Gamble's plea.   The first inkling the undersigned AUSA had that there were issues with Annie Dookhan or the JP Lab generally came in a letter originally sent to the Norfolk District Attorney on February 21, 2012 but received by the undersigned via email on March 5, 2012.   That letter revealed that Dookhan had broken various Lab Protocol in signing out a group of drug exhibits in June, 2011.   However, it also stated that:

> The chemist involved in this case has been employed by the Department for eight years. Prior to this incident, she had no personnel issues and was well respected for the accuracy of her work and her dedication to the Laboratory's mission.   In review of the incident, the managers at the Laboratory did not believe there was any reason to believe that the integrity of the samples had been affected by the breach in protocol or the late entries in the log book.   However, the chemist was removed from all responsibilities involving laboratory analysis as of June 21, 2011.

> The Commissioner's office first became aware of this incident on December 1.   The Laboratory managers had not reported this incident to the DPH Central Office because they did not appreciate its potential legal significance and because of their opinion that the integrity of the test results had not been affected. The Central Office conducted its own investigation of the incident and confirmed that there was no evidence to suggest that the

integrity of the results was impacted by the documentation issue with the log book.

Letter from Linda Han DPH Director of Laboratory Services to Norfolk District Attorney Michael

Morrissey (February 21, 2012) (attached as Exhibit 10).[9]   Although it appears that others in the

United States Attorney's Office were made aware of these same issues approximately one month

earlier, there is nothing in the record of this case, in the 2255 Motion, or in the massive amounts of

discovery produced by the United States Attorney's Office to date suggesting that the government

was told anything else untoward about Dookhan or the JP Lab prior to August, 2012 when reports

began to be widely disseminated. See Motion to Vacate, Exhibits B-F (newspaper articles about the

JP Lab issued in the Summer and Fall of 2012). Because the government didn't know about these

issues, there can be a viable Brady claim only if the government is chargeable with that knowledge

because Dookhan (a third-party expert who worked for the state) could be considered part of this

---

[9] Disclosure of such information is governed by Ruiz v. United States, 536 U.S. 622 (2002) (no requirement to disclose impeachment information prior to entering plea agreement with criminal defendant), thereby further demonstrating the futility of Jones' claim here.

   As Judge Stearns recognized in Wilkins:

   The practical import of this limitation [that Brady is a trial rule and not a "structural one] directly impacts the government's duty of disclosure in a plea bargaining context. "[T]he Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant." United States v. Ruiz, 536 U.S. 622, 633, 122 S.Ct. 2450, 153 L.Ed.2d 586 (2002). Although the holding in Ruiz does not dilute the requirement that a guilty plea be voluntary to satisfy constitutional standards, the Court specified that "impeachment information is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary ('knowing,' 'intelligent,' and 'sufficient[ly] aware')." Id. (emphasis and alteration in original). Instead, "the law ordinarily considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply in general in the circumstances—even though the defendant may not know the specific detailed consequences of invoking it." Id. (emphasis in original); see also United States v. Mathur, 624 F.3d 498, 507 (1st Cir.2010) (" Ruiz teaches that Brady does not protect against the possible prejudice that may ensue from the loss of an opportunity to plea-bargain with complete knowledge of all relevant facts. This makes good sense: when a defendant chooses to admit his guilt, Brady concerns subside.").

943 F. Supp. 2d. at 255. The Mathur Court also noted that, "Although we recognize that plea negotiations are important, that fact provides no support for an unprecedented expansion of Brady." 624 F.3d at 507

"prosecution team."  E.g., United States v. Bender, 304 F.3d 161, 164 (1st Cir. 2002).

The United States Attorney's Office historically dealt with the Jamaica Plain Lab principally on so-called adoption cases, i.e., cases that begin with state arrests and are subsequently charged in federal court after any drugs seized are processed into evidence by the local police department and sent to the JP Lab.   Typically, the United States Attorney's Office would deal with the lab on specific cases only to determine when drug certifications would be available in cases in which no field test was done and to prepare chemists to testify in those cases in which it became necessary. The undersigned AUSA (whose practice has included a substantial number of such cases since approximately 2006) believes that he has been to the JP Lab on one occasion, met Annie Dookhan once (all involving other cases), and communicated with her on occasion regarding the expected date on which drug certificates would be issued.   Communications about the availability of certifications or requests for cocaine base testing were normally done by email or fax to a lab supervisor and by email to the individual chemist if his or her identity was known.

During the period that the undersigned worked on cases in which the drug certifications were issued by the JP Lab, the government regularly sought the issuance of criminal complaints or the return of indictments based on field tests and other circumstantial evidence if the certification had not been issued.   In those cases, certifications were normally obtained directly from the Boston Police Department's Drug Depository, which is responsible for handling drug exhibits after they are processed into evidence and after testing is complete.[10]

In this case, the Criminal Complaint and Indictment to which Gamble pled guilty were both

---

10  The undersigned has been informed that the JP Lab received two Project Safe Neighborhood grants in consideration of its assistance on federal cases; the first was in the amount of $10,000 and covered the period between 9/11/2009-06/30/2010; the second was in the amount of $20,000 and covered the period between 7/1/2011-03/31/2012.

issued before the drug certification. Compare Criminal Complaint (8/31/10) and Indictment (9/23/10) with JP Lab certifications issued on 11/29/10. The government has been unable to document any communications with the JP Lab or Dookhan about this case.

The First Circuit has not expressly addressed the issue of whether outside experts like Dookhan can be part of the "prosecution team" under Brady.[11] But see Sleeper v. Spencer, 453 F. Supp. 2d 207 (D. Mass. 2006)(Ponsor, J.)(held on collateral review that, Director of Forensic Services at Bridgewater Hospital who testified at Petitioner's state murder trial and who "worked regularly with the Commonwealth, completing numerous forensic examinations and testifying at trials" was not member of prosecution team for Brady purposes). Other circuits have also held that such experts are not part of the "prosecution team," thereby demonstrating that the Brady claim fails.

One such case is United States v. Stewart 433 F.3d 273, 298 (2d Cir. 2006). It arose out of the prosecution of Martha Stewart and others on an insider trading scheme. At trial, the government called Lawrence F. Stewart ("Lawrence"), a civilian Secret Service employee and its Laboratory Director and Chief Forensic Scientist, to give an expert opinion regarding his analysis of

---

[11] As was noted in Wilkins, the First Circuit in Junta v Thompson, 615 F.3d 67, 74 n.5 (1st Cir. 2010) assumed without deciding that a state medical examiner might be considered a member of a prosecution team investigating a homicide. The role of a state medical examiner in a death investigation is far different that the role of the chemist here. Typically, the medical examiner gets involved at the outset of the investigation by recovering the body, is provided investigative reports in arriving at a cause of death and will work directly with investigators through the autopsy process to develop potentially critical leads as to the cause, time, and manner of death. See, e.g., M.G.L.c. 38, §§ 1, 4, 5 (statutes contemplating coordination between the medical examiner and the district attorneys in violent death investigations). Other First Circuit decisions in this area also reflect the real limitations as to who is on the "prosecution team." Compare United States v. Hall, 434 F.3d 42 (1st Cir. 2006)(refusing to extend "prosecution team" to cooperating witness); and United States v. Bender , 304 F.3d 161 (1st Cir. 2002)(same ) with Mastracchio v. Vose, 274 F.3d 590 (1st Cir. 2001)(extending prosecution team in Rhode Island case to police officers responsible for safety of witness pending trial and who had supervised his debriefing based on "intense involvement" with state prosecutors in witnesses' protective custody).

notations written on a document prepared by one of the defendants.   Id. at 295.   Several months

later, the government discovered that Lawrence made material misstatements in his trial testimony.

On appeal, the defendants argued that the government violated Brady duty with respect to

Lawrence's testimony.   Stewart, 433 F.3d at 297-99.   Defendants claimed that the scope of the

"prosecution team" should be construed to impute Lawrence's false testimony to the prosecutors

themselves because the Supreme Court has held that Brady obligations extend to all persons "acting

on the government's behalf."   Id. at 298-99; see Kyles v. Whitley, 514 U.S. 419, 437 (1995).

Because Lawrence was a "government official" working in conjunction with the prosecution, the

defendants argued that he was necessarily part of the prosecution team. Stewart, 433 F.3d at 298.

This is a stronger argument than the one made here, as Dookhan worked for the state.[12]

---

[12] See United States v. Risha, 445 F.3d 298, 304 (3rd Cir. 2006) (evidence possessed by state agents may be constructively possessed by government; court should consider "(1) whether the party with knowledge of the information is acting on the government's 'behalf' or is under its 'control'; (2) the extent to which state and federal governments are part of a 'team,' are participating in a 'joint investigation[,'] or are sharing resources; and (3) whether the entity charged with constructive possession has 'ready access' to the evidence."); United States v. Bender, 304 F.3d 161, 163-164 (1st Cir. 2002) (Court rejected defendant's claim that his conviction should be set aside because government failed to disclose witness's medical treatment records, noting that it was questionable whether government's discovery obligations were triggered given that Brady v. Maryland does not require "a prosecutor to seek out and disclose exculpatory or impeaching material not in the government's possession" and the witness's "mental health records were never in its possession or under its control... [as] at all relevant times, [the witness] was a prisoner in the custody and control of the State of Maine" and "[t]here is no evidence…that the prosecutor…was aware of [the witness's] mental health history"); and Moon v. Head, 285 F.3d 1301, 1310 (11th Cir. 2002) (refusing to impute to Georgia prosecutor evidence possessed by the Tennessee Bureau of Investigation ("TBI"), even though TBI witness testified at Georgia trial because, inter alia, the Georgia and Tennessee agencies shared no resources or labor and the TBI agents were not under the direction or supervision of the Georgia officials).   But cf. United States v. Antone, 603 F.2d 566, 569-570 (5th Cir. 1979) (in a case where the state and federal governments "pooled their investigative energies" and the "entire effort was marked by [a] spirit of cooperation," the state team's knowledge that the lawyer of a key government witness was paid with state funds had to be imputed to the federal team, and thus the government should have known of witness's false testimony concerning payment).   And see United States v. Olsen, 704 F.3d 1172, 1183 (9th Cir.), reh'g denied, 737 F.3d 625 (2013) (not deciding the "complex question of whether suppression occurs under Brady and [Kyles] when a federal

The Second Circuit disagreed. It held that the determination of whether an individual is an "arm of the prosecution" under Brady is made by "examining the specific circumstances of the person alleged to be an 'arm of the prosecutor,' " not by a broad, categorical approach.   Stewart, 433 F.3d at 298.   This determination, the Court held, "does not turn on the *status* of the person with actual knowledge," but rather on what the person *did. . . ."*   Id. (emphasis in original); see also Pina v. Henderson, 752 F.2d 47, 49 (2d Cir. 1985)(refusing to apply "descriptive term" of "arm of the prosecutor" to parole officer not working "in conjunction" with police or prosecutor).

Applying these principles to the record before it, the Court noted that "[Lawrence's] role was limited to matters concerning his area of expertise."   Stewart, 433 F.3d at 298.   Lawrence's duties included analyzing a document, explaining the forensic ink tests that had been conducted, discussing possible testimony that the defense expert would give, assisting the prosecutors in developing cross-examination questions with respect to technical aspects of testing, taking part in a mock examination prior to trial, and testifying at trial regarding the tests and his resulting conclusions.   Id. The Second Circuit held that those duties (far exceeding what Dookhan did here) "suggest[ed] that [the expert] was not in any way involved with the investigation or presentation of the case."   Id. at 298-99.   Concluding that the witness had "acted only in the capacity of an expert witness…and not as a 'fully functioning member of the prosecution team,' " the Second Circuit held that the expert's knowledge should not be imputed to the prosecutors.   Id. at 299 (noting that Lawrence "did not interview witnesses or gather facts, nor, with the exception of the "@60" worksheet, did he review documents or develop prosecutorial strategy").

The Fifth Circuit reached a similar result in Avila v. Quarterman, 560 F.3d 299, 305, 307 (5th

---

prosecutor does not obtain or reveal information favorable to the defendant that is contained in a state internal investigation file").

Cir. 2009), a case before it on collateral review. Avila had been convicted of capital murder in Texas, sentenced to death, and thereafter filed a federal habeas writ that the district court allowed based on its determination that a pathologist was part of the prosecution team. The government subsequently appealed the district court's partial grant of federal habeas relief to the Fifth Circuit.   Id. at 302. One of the principal grounds argued in the Petition was that the state of Texas had improperly suppressed an allegedly exculpatory pathology opinion held by Dr. Harry Wilson, Id. at 305, and whether the District Court's ruling that Wilson was part of the "prosecution team" was correct.

Dr. Wilson had prepared a pathology report regarding the victim's injuries around the time of the victim's death.   Avila, 560 F.3d at 305.   The State thereafter designated Dr. Wilson as an expert based on this involvement in the victim's medical care.   Id.   During the investigation of the underlying offense, the State contacted Dr. Wilson to discuss the case, and he was present when the defense's pathologist conducted a second autopsy on the victim.   Id.   The State did not call Wilson at either phase of Avila's trial for capital murder, but instead relied on the medical examiner's testimony. Post-conviction, Wilson submitted an affidavit indicating that his report was preliminary and that he had held opinions regarding the cause of the victim's death that were favorable to the defense. Avila contended that the government was chargeable with knowledge of those opinions because, under Brady, Wilson was a member of the prosecution team.   Id. at 308.

Like the Second Circuit in Stewart, the Fifth Circuit held that whether someone is a member of the prosecution team (which it acknowledged to include "both investigative and prosecutorial personnel") depends on what the individual did. Avila, 560 F.3d at 308. Because Wilson's role was limited to his activities as a pathologist, it held that he was never part of the "prosecution team," and therefore reversed the grant of the writ by the district court. See Avila, 560 F.3d at 308.   See also Sargeant v. Secretary, Florida Department of Corrections, 480 Fed.App.523 (11th Cir. 2012), cert.

denied, 135 S.Ct. 585 (2013)   (held, state habeas court did not incorrectly apply clearly established law when it found that state toxicologist's knowledge could not be imputed to a state prosecutor; court also defined the prosecution team as 'the prosecutor or anyone over whom he has authority and include both investigative and prosecutorial personnel").

Application of these principles here shows that Dookhan was never part of the prosecution team in this case because the undersigned federal prosecutor never had any authority over her.   Her involvement in this case was limited to being assigned to test the drugs purchased from Gamble and then issuing a certification publishing the results.   That involvement in the investigation and prosecution of this case pales in comparison to that of the experts in Stewart and Aviles and shows that Gamble's Brady claim fails on this basis as well.[13]

### 4.   Gamble has failed to state a cognizable due process claim for outrageous misconduct under *Ferrara*

A second theory of relief here is a due process claim based on the kind of outrageous

---

[13] To the extent that the motion to vacate offers authorities to support his claim that Dookhan was somehow a member of the prosecution team in this case, it squarely misses the mark.   For example, both Commonwealth v. Rodrigues 2013 WL 2420416 at 4-5 (Mass. Superior Ct. 2013) and Commonwealth v. Baez-Franco No. 2009-01151, slip op. at 6 (Mass. Superior Ct. 2013) (cited at page 17 of the Motion to Vacate) were state court decisions that concluded that Dookhan, a state employee, was a "government agent" without the slightest consideration of federal law under Brady and did so under the broad discretion provided state court judges under Massachusetts Rule of Criminal Procedure 30(b) (permitting the grant of a new trial "if it appears that justice was not done."   Rodriguez (Exhibit R to Motion to Vacate) at 3 . In Ohio v. Defronzo, 394 N.E2d1027 (Ohio Court of Common Pleas 1978) (cited in the Motion to Vacate at page 13) the Court of Common Pleas had before it evidence of misconduct in the testing and trial testimony done in the case before it, (i.e., exactly the evidence that Gamble *lacks* here)   Compare also Commonwealth v. Sleeper, 760 N.E.2d 693, 697 (Mass. 2002) (Director of Forensic Services at Bridgewater Hospital who reviewed police reports, witness statements, hospital records, examined the defendant for 7 hours and then testified as an expert at trial was not part of the "prosecution team" because he did not "participate in the investigation or evaluation of the case and. . . [did not] regularly report or with reference to a particular case have [not] reported to [the prosecutor's] office.". It was this ruling that was subsequently upheld by Judge Ponsor on collateral review.   See discussion at page 25, above.

prosecutorial misconduct found to be present in <u>Ferrara v. United States</u>, 456 F.3d 278, 290-294 (1st Cir. 2006) (allowing Petitioner to withdraw plea where government engaged in "blatant misconduct" by withholding exculpatory information and making affirmative misrepresentations sufficiently outrageous so as to support a claim that plea was involuntary).[14]

<u>Ferrara</u> held that a defendant warned of the usual consequences of pleading guilty and the range of potential punishment for the offense must make two showings in order to set his plea:

First, he must show that some egregiously impermissible conduct (say, threats, blatant misrepresentations, or untoward blandishments by government agents) antedated the entry of his plea. Second, he must show that the misconduct influenced his decision to plead guilty or, put another way, that it was material to that choice. In mounting an inquiry into these elements, a court must consider the totality of the circumstances surrounding the plea.

456 F.3d at 290.   In assessing the application of these principles here, it is necessary to consider carefully the specific facts present in <u>Ferrara</u> because to do so shows that the allegations here are woefully inadequate to even approach a *prima facie* claim.

In 1990, Ferrara and seven others were indicted for racketeering and related offenses arising out of their alleged involvement in the Patriarca Crime Family. The focal point of the indictment charged Ferrara and his co-defendants with conspiring to participate in the affairs of a Racketeering Enterprise known as the Patriarca Crime Syndicate.   To establish the requisite pattern of racketeering activities, the indictment alleged a host of predicate acts including the allegation that Ferrara and his co-defendant Barone had conspired to kill and had killed Vincent James Limoli. 456 F.3d at 281.   The government's theory of this part of the case was that Ferrara had ordered Barone

---

[14] <u>Ferrara</u> is of course based on <u>Brady v. United States</u> and its progeny. <u>See, e.g.</u>, <u>McMann v. Richardson</u>, 397 U.S. 759, 769 (1970) ("[T]he decision to plead guilty before the evidence is in frequently involves the making of difficult judgments," and, "[i]n the face of unavoidable uncertainty, the defendant and his counsel must make their best judgment as to the weight of the State's case."); <u>Bousley v. United States</u>, 523 U.S. 614, 619 (1998) (characterizing <u>Brady v. United States</u> and <u>McMann</u> as having rejected challenges to the validity of guilty pleas where the defendants had "misjudged the strength of the Government's case or the penalties to which they were subject").

to kill Limoli because Limoli had stolen drugs from another syndicate member.   Id.

Barone's brother-in-law (Walter Jordan) was the star witness for this aspect of the government's case.   Jordan allegedly participated in Limoli's murder and then fled.   After arrest, Jordan agreed to cooperate in exchange for both immunity and protection.   Id. Jordan testified in the grand jury that Ferrara had ordered Limoli's murder in retaliation for the theft of syndicate drugs. He also stated that he and Barone then left Boston because Ferrara was going to kill them.

In anticipation of trial, investigators and one of the prosecuting AUSA's met with Jordan in Salt Lake City, Utah for a series of meetings.   After the last session, Jordan stated that Ferrara had never been consulted with respect to Limoli's murder and had never either ordered or "blessed" it.

The AUSA was thereafter advised of Jordan's statement that Ferrara had never ordered that Limoli be killed.   In response, the AUSA was alleged to have set up a conference call with Jordan in which Jordan repeated his claim. In response, the AUSA set up another trial preparation meeting in which Jordan again recanted his grand jury testimony, after which the AUSA allegedly told the investigators to "straighten Jordan out."   When the AUSA later returned to the meeting, Jordan (fearful of losing both his immunity from prosecution and his protection against retaliation from the Patriarca family) reverted to his original version of the facts in which he claimed that Ferrara had ordered the Limoli hit.   The AUSA then allowed Ferrara to plead guilty without disclosing Jordan's contradictory statements and after he had allegedly directed the investigator to "clean up" a memorandum recounting Jordan's about face on this critical issue.   Id. Ferrara was subsequently sentenced to 22 1/2 years in jail.

Nearly 10 years later, Jordan confessed that he had committed perjury with respect to the reasons for Limoli's murder.   He stated that the AUSA and the investigators knew about the perjury but had nevertheless let Ferrara plead guilty and had permitted Jordan to repeat his falsehoods at

another related trial.   Ferrara thereafter filed a Motion to Vacate his plea based on Jordan's

recantation and the AUSA's alleged complicity in his lies.   Lengthy hearings followed in which the

district court found that Jordan had lied and the AUSA, by allowing Ferrara to plead with knowledge

of Jordan's recantation, had violated Ferrara's due process rights.   456 F.3d at 286.

Faced with this record, the First Circuit affirmed the district court's order allowing Ferrara's

motion to vacate based on the prosecutor's due process violation in failing to disclose Jordan's

recantation and his manipulation of that testimony in order to obtain a conviction on charges

involving murder.   The Court first recognized that a defendant's misapprehension of the evidence

against him is an insufficient basis on which to vacate his plea.   Id at 291.   Rather, it said, "it is only

when the misapprehension results from some particularly form of pernicious conduct that due

process concerns are implicated." Id.   As the court then stated:

Let us be perfectly clear: due process does not normally require the prosecution either to turn
over the whole of its file or to disclose every shred of information that might conceivably affect the
defendant's decision making. See Bouthot, 878 F.2d at 1512. Even though a defendant obviously
would be interested in knowing all the strengths and weaknesses of the government's proof before
deciding whether to plead guilty or risk a trial, the government's refusal to render the whole of its
case transparent before a defendant makes that election does not, in the ordinary course, constitute
the kind of severe misconduct that is needed to render a plea involuntary.

Under limited circumstances, however-everything depends on context-the prosecution's
failure to disclose evidence may be sufficiently outrageous to constitute the sort of impermissible
conduct that is needed to ground a challenge to the validity of a guilty plea. See Bouthot, 878 F.2d at
1511 (stating that a defendant could attack his plea under Brady v. United States by showing that the
prosecution's failure to provide information constituted a "material omission tantamount to a
misrepresentation"); see also Matthew v. Johnson, 201 F.3d 353, 364 n. 15 (5th Cir.2000)
(suggesting that, "[e]ven if the nondisclosure is not a Brady [v. Maryland] violation, "there may be
situations in which the prosecution's failure to disclose evidence makes it "impossible for [a
defendant] to enter a knowing and intelligent plea").

Here, we are dealing with more than simple neglect to turn over exculpatory evidence; the
government manipulated the witness (Jordan) into reverting back to his original version of events,
then effectively represented to the court and the defense that the witness was going to confirm the
story (now known by the prosecution to be a manipulated tale) that the petitioner was responsible for
killing Limoli. These egregious circumstances make this one of those rare instances in which the

government's failure to turn over evidence constitutes sufficiently parlous behavior to satisfy the misconduct prong of the involuntariness test.

* * * * * * *

      To sum up, the government's actions in this case do not depict some garden variety bevue but, rather, paint a grim picture of blatant misconduct. The record virtually compels the conclusion that this feckless course of conduct the government's manipulative behavior, its failure to disclose the Jordan recantation and/or the Coleman memo, and its affirmative misrepresentations (not anchored to any rational and permissible litigation strategy) constituted a deliberate and serious breach of its promise to provide exculpatory evidence. In the circumstances of this case, then, the government's nondisclosure was so outrageous that it constituted impermissible prosecutorial misconduct sufficient to ground the petitioner's claim that his guilty plea was involuntary. See Brady v. United States, 397 U.S. at 755, 90 S.Ct. 1463[ (1970)]; [United States v. ]Correale, 479 F.2d 944, 947 (1st Cir. 1073).

456 F.3d at 291-293 (footnotes omitted).

      The government has quoted at such length from Ferrara because to even consider its facts is

to realize how futile it is for the defendant to attempt to analogize to them here.   First, as set forth

above, Annie Dookhan's misconduct is not attributable to the prosecution because she was an

independent third-party expert who worked for the Commonwealth of Massachusetts, was therefore

not part of the team prosecuting Gamble in deferral court, and never acted as an "agent of the federal

government."   See discussion above.[15]   Hence, her misdeeds (not one of which has been shown to

---

[15] In his Motion to Vacate, Gamble cites numerous cases that he says show that, under Ferrara and Brady v. United States, 397 U.S. 742 (1970), misconduct is actionable under the due process clause if taken by any "agent of the state."   Motion to Vacate at 12.   That assertion ignores both the facts and the procedural context of each case (many of which did not involve pleas), and that none involved circumstances remotely like those here.   Ferrara, of course, involved allegation that the prosecutor and the principal investigators engaged in blatant misconduct and the Court's decision made repeated references to the activities of the "prosecution team." 456 F.3d at 282,   285,   288, and 293.   Indeed, all of the cases cited involve allegations of misconduct by core members of the particular prosecution to whom these obligations should appropriately apply.   See Limone v. Condon,372 F.3d 39,45 (1st Cir. 2004) (1983 claim in which it was alleged that former FBI agent Dennis Condon and former Boston Police Detective Frank L. Walsh, framed Limone, Greco, and Tameleo, assisted the Commonwealth of Massachusetts in wrongly convicting them on a charge of first-degree murder, participated in a cover-up, and allowed the three innocent men to languish in prison for years); Napue v. Illinois, 360 U.S. 264 (1959)(Prosecutor failed to correct false testimony

relate to the testing done in this case) should only rise to the level of a due process violation if the defendant had presented evidence that the government was aware of her alleged misdeeds at the time of Gamble's plea.   Because no such claim has even been raised and there was nothing for the government to disclose, the prosecution's conduct cannot approach "outrageousness." See also Wilkins, 943 F. Supp. 2d at 257 (even though one of the pleas in that case took place after receipt of the February 21, 2012 DPH letter, court noted that so-called "suppression of impeachment evidence concerning Dookhan…f[e]ll miles short of the 'rare instance' of sufficiently egregious misconduct inducing involuntariness of the kinds that figured in Ferrara.").

Second, Ferrara highlights what Gamble so clearly lacks—blatant government misconduct aimed at suppressing important matters of innocence and guilt *in the case before it*.   Gamble has utterly failed to point to anything that suggests that the drug testing in his case was flawed or that he was innocent of the charged offense.   He therefore fails the first Ferrara element for this reason as well. Wilkins, 943 F.Supp. 2d. at 257 (given the "overwhelming evidence" that the contraband carried was crack cocaine, court concluded that "nothing before it implicated "the crux of the first prong of the Ferrara exception-coercive conduct that compromises a defendant's claim of factual innocence"). See also United States v, Villasenor, 664 F.3d 673, 684 n.2 (7th Cir. 2011) (significance of information that   testifying chemist failed to follow laboratory procedures and had incorrectly labeled 23 exhibits during his tenure at the Drug Enforcement Administration, discovered by prosecutors after trial, was questionable given that the government later retested the evidence and, "[h]ad the impeachment evidence been available to the defense at trial, the government presumably would just have another chemist testify…."). Compare United States v.

---

by critical witness at murder trial); Pyle v. Kansas, 317 U.S. 213 (1942) (allegedly knowing use of perjured testimony at trial by state prosecutors); Mooney v. Holohan, 294 U.S. 103 (1935)(same).

Fisher, 711 F.3d 460, 646 (4th Cir.2013)(allowing motion to vacate where gross police misconduct went to the heart of the prosecution's case; dissent nevertheless argued that "a close reading of [Brady v. United States] reflects the scope of the court's meaning was in fact strictly limited and referred only to false misrepresentations directly designed to induce a defendant to plead guilty").

Finally, even if the government's failure to disclose misconduct by Dookhan in other cases (despite its plainly established ignorance of those actions) could be considered the type of "egregiously impermissible conduct" Ferrara requires, Gamble can still not make a showing that it could have been objectively material to his guilty plea.   Ferrara, 456 F.3d at 294 (in this setting, prejudice requires a determination that a "reasonable defendant standing in petitioner's shoes would likely have altered his decision to plead guilty had the prosecution made a clean breast of the evidence in its possession").   As set forth above, that plea was tendered: First, because Gamble knew the drugs in this case were cocaine; second, because Gamble knew that the government had substantial evidence unrelated to the JP Lab that the drugs sold in this case were cocaine; and third, pursuant to a cogent defense strategy that pleading guilty as part of a larger theme that Gamble now understood his past mistakes and was truly ready to change and that would help him get a substantial variance at sentencing.   See Brady v. United States, 397 U.S. at 752 (recognizing that, as of 1970, over 75% of convictions result from pleas of guilty, "a great many of them no doubt motivated by the hope or assurance of a lesser penalty than might be imposed if there were a guilty verdict after a trial to a judge or jury").   That strategy carried the day when the court reduced Gamble's sentence by 30% to 18 months after hearing Gamble state that he was ready to change for the benefit of his family, wanted to be there for his son, and had been profoundly affected by participating in various programs at Wyatt, including a "scared straight" program for teenagers.   See Sentencing Tr. (October 6, 2011) (attached as Exhibit 11) at 40-43 (Gamble's allocution in which he discussed

34

value of scared straight and other programs); 46 (in granting variance, Court noted that "the most important thing you said to me is not that you went and talked to those 18 and 19 year olds but that it made you feel good"). This success of Gamble's strategy confirms how futile his Ferrara claim is.

Again, Wilkins discussion of this issue in a related context deserves careful consideration:

> The court does not dismiss the representations of experienced defense counsel who state that they would not have advised their clients to plead guilty (or might have delayed giving such advice) had they known the extent of Dookhan's misconduct. Relying on its own experience, however, the court does not believe that there is a reasonable probability that either defendant would have forgone a guilty plea (whatever counsel's advice) and taken his chances before a jury in light of the strength of the government's evidence. Dookhan's mishandling of drug tests in other cases did not impugn the factual basis that supported the court's acceptance of the guilty pleas. In addition to the independent retesting of samples of the drugs seized from Merritt and Wilkins, there was overwhelming circumstantial evidence, again including defendants' own admissions, that they knowingly possessed and sold crack cocaine.   Moreover, this is not a case where the weight of the drugs seized affected the issue of the degree of guilt or the severity of the punishment as both Merritt and Wilkins qualified as career offenders because of their prior convictions. In sum, in light of the sheer weight of the untainted incriminating evidence and the appreciable benefit that defendants received in terms of the ultimate sentences for which their pleas made them eligible, both Merritt and Wilkins had strong incentives to plead guilty. Moreover, these incentives had nothing to do with the (then unknown) impact that information about Dookhan might have had on the jury, even assuming its admissibility. Rather, they had everything to do with defendants' own self-interest in avoiding almost certain conviction by a jury and subsequent sentencing as career offenders.

 Wilkins, 943 Fed. Supp. 2d at 258 (footnotes omitted).

The two footnotes included in this passage from Judge Stearns opinion dealt with the strength of the government's evidence that only a portion of the drugs from the underlying arrest had been tested and that the remaining bags "remained untouched" (evidence based on photographs taken of the drugs before they were sent to the State Police Lab to be re-tested exactly like the ones attached as part of Exhibit 6 here), and the Court's conclusion that "speculation that defendants might have been engaged in the sham street sale of counterfeit drugs is barely within the rim of the remotely possible" due to the repeated presence of the defendants in that case in the area around the

Pine Street Inn and its observation that, at the "street level," any "sale of a sham drug is extremely dangerous to an established dealer."   These observations apply equally to this case given the processing report and photographs showing that the drugs tested at the State Police Lab were "original" and "intact" and that Gamble was dealing in his own backyard and encouraged the UC to call him for future deals using the phone number that Gamble knew the UC already had.

In his supplemental memorandum, Gamble strains mightily to come up with a cogent claim for the extraordinary relief he seeks.   While he doesn't hesitate to call the JP Lab certificate "probably fraudulent," Supplemental Memo at 3, there is not a single fact to back that assertion up with respect to the testing done in this case at the JP Lab.   And while Gamble also attacks the additional testing done at the State Police Lab, it is curiously based on the presence of an empty plastic bag in the drug exhibit that went to the State Police lab marked with CC# 100465162 (the Boston Police Department number for this incident) and which Gamble somehow suggests raises "chain of custody" issues that would help to impeach Dookhan (who of course would never be called by the government) or "any other chemist that might testify."   Supplemental Memo at 3-4.   That bag is nothing more than the original heat sealed bag into which Sgt. Det. Keenan put the drugs after he had field tested them so that they could be placed in the District E-13 Drug Safe and then forwarded to the lab where they would have to be opened so that the contents of 1 bag could be tested.   Rather than calling the accuracy of the additional testing or the identity of the drugs into question, the fact that the original evidence bag was still with the drugs (along with Keenan's note) when the exhibit was sent for additional testing two years later only reinforces that the drugs depicted in the photographs taken by Det. Walsh on November 13, 2012 were the same drugs purchased by the UC. See Wilkins, 2014 WL at 2462554, *4 (rejecting claim that the "presence of virgin samples at the Hinton Lab during Dookhan's tenure corrupts the chain of custody").

Gamble's argument that strength of the evidence is fundamentally weaker than that in Wilkins and Merritt also fails.   First, it ignores the clarity of Gamble's plea colloquy in which he clearly and unequivocally admitted that he knew he was peddling cocaine and his failure to ever assert his actual innocence.   See generally Brady v. United States, 397 U.S. at 748 (because "a guilty plea is a grave and solemn act" that is accepted only with care and discernment, plea admissions are entitled to significant weight and should not be lightly disavowed); Wilkins, 2014 WL at 2462554, *5 (Rule 11 admissions are "especially compelling" in the absence of a claim of actual innocence or other explanation) .   Moreover, in both cases, there was substantial circumstantial evidence of drug identity that was in no way effected by Dookhan.   The drug deals here and in Wilkins were set up by conversations with an undercover police officer that was clearly drug related and here was confirmed by analyzing Gamble's cell phone post-arrest.[16]   Once the meet took place,   the UC here also met with but one person, thereby eliminating any uncertainty as to who the dealer actually was.   Moreover, Gamble engaged in exactly the same type of surveillance conscious behavior as Wilkins and Merritt had, in the way that he pulled the drugs from his waist and then placed them on a wall so that he would not have to deal directly with the UC. Gamble then got rid of the buy money immediately and boasted to the police that he could not be arrested because he didn't have any "marked money."   And his encouragement to get the UC to come back and buy more by bragging that his "shit" was "fire" was unlike anything the defendant's

---

[16] Gamble also claims that the post-arrest inspection of the recently called numbers (which verified that Gamble had just been in contact with the UC, runs afoul of the Supreme Court's recent decision in Riley v. California, --- S.Ct. ----, 2014 WL 2864483 (June 24, 2014) and that this somehow weakens the government's evidence.      Of course he is wrong because: (i) there is nothing in Riley to indicate that it will be applied retroactively on collateral review; (ii) the Court also recognized that warrantless cell phone searches may still be appropriate under the exigent circumstances exception in order "to prevent the imminent destruction of evidence in individual cases." Id. 2014 WL 2864483, *19; and (iii) the same information could have been developed simply by calling the number used by the UC in order to see if Gambles's phone rang (as it obviously would have).

in Wilkins and Merritt did or said. In short, while the evidence in this case of course differs from that

in Wilkins and Merritt, it is no less damning and similarly demonstrates that summary dismissal of

the 2255 is required.

## CONCLUSION

The Annie Dookhan scandal does not change the law applicable to this motion nor relieve

Theodore Gamble from the heavy burden he has in seeking to vacate his plea under 28 U.S.C.

§ 2255.   Because the record shows that the substance purchased from Gamble was cocaine, and

because Gamble has failed to establish a cognizable claim for relief under Brady or

Ferrara, the motion to vacate should be summarily dismissed.

<div style="margin-left: 40%;">

Respectfully submitted,
CARMEN M. ORTIZ
UNITED STATES ATTORNEY

By:    /s/ John A. Wortmann, Jr.
JOHN A. WORTMANN, JR.
Assistant U.S. Attorney
(617) 748-3207

</div>

## CERTIFICATE OF SERVICE

The government hereby certifies that the foregoing was this day filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those indicated as non-registered participants.

<div style="margin-left: 40%;">

/S John A. Wortmann, Jr. 9/15/16
JOHN A. WORTMANN, JR.
Assistant U.S. Attorney

</div>